**Sanchez v. Sanchez**

C.P. of Chester County, no. 0241N2000.

*Mark R. Ashton,* for plaintiff.
*Albert Momjian* and *Catherine M. McFadden,* for defendant.

MAHON, *J.,* July 9, 2001—And now, July 9, 2001, on consideration of the exceptions of Michael A. Sanchez (Father) to the report and recommendations issued by Hearing Officer Lynn A. Snyder following, and on the basis of, a hearing conducted on April 4, 2000, in the matter of the complaint for support presented by Jennifer L. Sanchez (Mother); as well as Father's petition to open the record and for modification, special relief and credit on arrearages; we enter the following:

## OPINION

The parties hereto were married in March 1982 and separated in October 1987. Three children were born of the marriage: son Andrew, age 16 at the time of the hearing;[1] and two daughters: Jessica, age 15;[2] and Shauna, age 12.[3] By agreement dated April 21, 1987, following

---

1. DOB September 17, 1984.
2. DOB December 26, 1985.
3. DOB April 5, 1988.

their separation, the parties reached an accommodation as to the equitable division of the marital estate and other matters, including custody and support of the children, attendant upon the dissolution of the marriage. On the matter of child support, the agreement required Father to remit a monthly sum to Mother for support of the children and to reimburse Mother for submitted expenses incurred including those related to the children's out-of-pocket medical, dental, optician, orthodontic, extracurricular, travel and vacation expenses. The unallocated monthly obligation of Father is the subject of an annual cost of living escalator of six percent and, in 2000, the current year at the time of the hearing, equaled $3,250 per month. A final decree in divorce incorporated the parties' property settlement agreement.

Both parents remarried following their divorce and it appears that they were able to manage their continuing reciprocal obligations toward their children without judicial intervention throughout the more than 13 years between their separation and the commencement of these proceedings by Mother on February 9, 2000, by the presentation of a complaint for support. Father attributes Mother's dissatisfaction with their long-standing arrangement to her divorce from her second husband and the adverse effect on her circumstances resulting from the loss of the resources her second husband contributed to the household. We do not find it necessary to our decision to weigh the strength of the evidence supportive of this proposition.[4]

---

4. We note that Mother responded affirmatively during the course of the hearing to the following question put to her by Father's counsel: "The removal of your current husband from the household creates a

Following an evidentiary hearing on April 4, 2000, the hearing officer entered an interim order dated June 6, 2000, in which she determined that Father's net monthly income is $18,198 and Mother's net income is $921. Father was ordered to remit to the benefit of Mother the monthly sum of $8,543, which includes $6,043 in current support and $2,500 toward total arrearages of $24,203.75 accrued in the period since the filing of Mother's complaint; and, additionally, to pay all unreimbursed medical expenses related to the children in excess of an annual total of $250 as well as "all reimbursed medical/dental, optical, orthodontia and therapy costs,"[5] to provide comprehensive medical insurance for the children, to pay directly to Andrew's private school the tuition then equaling $1,000 per month and all costs related to books and fees, to make all car payments and insurance premium payments related to Andrew's automobile, and to pay certain fees and costs related to the proceedings.

The hearing officer's report and recommended order, dated May 25, 2000, includes the determination that Father's income available for the support of these children is $8,414 consisting of a net monthly income after

hardship for you, does it not, in terms of meeting expenses?" See transcribed notes of testimony of the hearing conducted on April 4, 2000 (N.T.) at page 48.

5. These provisions are inconsistent in that the former, found in the pre-printed portion of the order, includes an obligation of Mother to pay the first $250 of unreimbursed medical expenses while the latter, found in the inserted, typewritten portion of the order headed "other conditions," includes no obligation on the part of Mother to pay any portion of the unreimbursed medical expenses and places the whole of this expense on Father. Neither party has challenged or requested clarification of the aggregate effect of these provisions.

taxes of $32,172[6] as the founder and chief executive officer of Sanchez Computer, and reasonable monthly household expenses of $23,754 related to a 10-acre property improved by a $3.3 million home on the Main Line;[7] and that Mother had no income available for support since her monthly expenses of $2,069 related to the five-bedroom detached residence in which she and the children live in Phoenixville, Chester County, exceeded her net monthly income of $921 as a part-time receptionist at the Phoenixville Hospital. The hearing officer further determined that the reasonable expenses attributable to the children equaled $8,253 per month.[8] On these bases as well as the formula described in *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984),[9] the hear-

---

6. Father challenges this determination as unsupported by the record. Father's gross income in the year 2000 as indicated by his exhibit P-1 admitted into evidence on April 4, 2000, was $293,567 consisting of wages, interest, dividends, and rental and partnership income. Net income after federal, state, and local taxes was $218,375 or $18,198 per month: the figure found by the hearing officer in the context of the interim order of June 6, 2000. Father contends that this is the only income figure supported by the record and that the inconsistent finding of the hearing officer in the context of the report that Father's net income is $32,172 is error. For the reasons discussed in the text, we agree with Father's position on this issue.

7. Father's assets also include a vacation home in Maryland recently purchased for $1.65 million; a collection of luxury automobiles; a corporate turbo-prop aircraft; and other trappings typical of the lifestyle of a wealthy entrepreneur with a net worth at the time of the hearing of in excess of $110 million consisting primarily of issued stock of the corporation Father founded.

8. $99,036 per year.

9. Applicable in situations where the income of the parent(s) is greater than the maximum contemplated by the statewide support guidelines promulgated by general rule of the Supreme Court pursuant to 23 Pa.C.S. §4322.

ing officer recommended the imposition of a support order requiring Father to remit on behalf of Mother monthly the whole of the childrens' expenses consisting of an unallocated payment of $6,043 and an additional $2,210 representing reimbursement for Andrew's tuition and books at the Devon Preparatory School in Malvern ($1,020/month); Andrew's automobile-related expenses including insurance in connection with the 2000 model Ford Mustang which Father had recently purchased for him ($726/month); and Mother's out-ofpocket expenses for all three of the childrens' medical, dental, optician, orthodontic and other therapeutic services ($464).

In his exceptions, Father seeks review of the recommended support order and, specifically, Father contends that Mother adduced no evidence justifying judicial intervention in the first instance since it is undisputed that Father has paid without fail and has regularly supplemented the unallocated $3,250 in monthly child support by reimbursing Mother for any additional expenses related to the care of their children.

In addition, Father contends that the support obligation determined by the hearing officer is in excess of the reasonable needs of the children and, particularly, that the hearing officer failed to properly consider the expenses incurred by Father in the care of the children while in his custody; improperly attributed to Mother certain expenses which had been borne by Father; largely accepted without substantial evidentiary support Mother's contention that the reasonable expenses for the children were $750, $300, and $500 per month for entertainment, gifts and vacation, respectively; and improperly attrib-

uted 75 percent of Mother's home debt service to the children.

Finally, Father asserts that the hearing officer improperly calculated Father's income available to meet his support obligation. This contention challenges the hearing officer's determination to include as income sums available to Father at the time of the hearing by borrowing against the value of a large block of Sanchez Computer stock he had deposited with J.P. Morgan & Company in an "exchange fund" which he described as a "diversification technique" and which had permitted him in recent years to make use of some $9 million of the value of his corporate securities for the purposes of renovating the Devon homestead and purchasing the vacation residence as well as providing a flow of cash offsetting some $65,000 per month in interest expense related to the margin borrowings. The hearing officer apparently concluded[10] that irrespective of Father's reported income for federal tax purposes, his "real" income resources were at least equivalent to his expenses (before considering the $65,000 monthly exchange fund interest expense[11])

10. The hearing officer's explanation for the determination of Father's net income in the report consists of nothing more than an assertion of its utility in marginal note 7 as follows: "Father through his margin loan is engaged in deficit financing. Nonetheless he is meeting not only the $32,172 expense listed in P-1 but also the $65,000 monthly payment on the [margin] loan. Therefore, $32,172 shall be utilized as the net monthly figure."

11. Father's net income figures do not account for the margin borrowing interest expense. This is the proper treatment under such cases as *Commonwealth ex rel. Gitman v. Gitman,* 428 Pa. 387, 393, 237 A.2d 181, 185 (1967).

or $32,174 per month.[12] Father concludes from this that the hearing officer included in his monthly income, margin borrowing of $13,976[13] and contends that this constituted legal error.

In his petition, Father asserts that Mother was required to but did not inform him of the fact that their son Andrew had been criminally cited on a particular date in March 2000 at a time prior to the hearing before Hearing Officer Snyder for reckless driving at 3 a.m. and for violating his junior license while driving the automobile Father recently purchased for him; that Andrew has not reimbursed Father $4,000 for the automobile as they had agreed;[14] that the value of Father's Sanchez Computer stock has plummeted to around $16.50/share[15] since the hearing when its value in excess of $33/share produced an aggregate valuation of Father's holdings of in excess of $110 million; that, as a consequence of this decline, Father has been notified that his ability to borrow against his margin account with J.P. Morgan & Co. has been

---

12. We discuss below the error implicit in equating borrowing capacity with income or earning capacity. The hearing officer's conclusion that Father's income must be at least equivalent to the household expenses fails to consider the contribution of Father's second wife, whose separate income in 1999 was in excess of $80,000, to those expenses.

13. Monthly expenses of $32,174 minus reported net monthly income of $18,198.

14. From Mother's response to the petition it appears that this reimbursement may now have been accomplished. In any event, this is a matter of a contractual relationship between Father and Andrew and our decision herein leaves this contract and any remedies available thereunder unaffected.

15. At the time of this order, Father's Sanchez Computer stock (NASDAQ symbol SCAI) has dropped even further, trading at around $13/share.

exhausted[16] thereby making it impossible for him (without liquidating assets)[17] to comply with the recommended support order under which $13,974/month of "income" was imputed to Father based on his ability to borrow against the margin account; and that Father should be credited for direct payments of $14,072.99 and $9,928 representing expenses of the two daughters' month-long trip to Australia.[18]

Although the issues raised by Father include matters of considerable interest and significance, we find it necessary to our decision to resolve only the challenge raised to the hearing officer's determination of Father's income and the childrens' reasonable expenses.

Father's challenge to the propriety of the inclusion of margin borrowing in income available for support appears to us to be well-founded. Of course, the extent of a father's assets are certainly properly considered in fashioning a child support order.[19] We see no reason, how-

16. Our decision that it was an error to include margin borrowing capacity as income makes it unnecessary to reopen the record for receipt of evidence of this change in circumstances.

17. In her response to the petition, Mother contends that the liquidation required in order to comply with the hearing officer's recommendation, assuming the entire obligation is met by this method and the stock price remained at the depressed value alleged, would require the sale of only 437 shares per month out of Father's holdings of in excess of 3 million shares and this trivial reduction would constitute no hardship to Father and would not have (as an insider sale) any adverse effect on the stock price generally.

18. We have considered Father's direct payment of expenses, including those related to his children's vacations, in fashioning the order we enter herewith.

19. See, for example, the Divorce Code provisions concerning the statewide support guidelines codified at 23 Pa.C.S. §4322 ("In determining the reasonable needs of the child . . . and the ability of the

ever, to equate ability to earn with capacity to borrow. No authority presented to us by the parties or discovered by our research has held that a father's ability to secure borrowings by his assets is itself "income" available for support. The hearing officer seems to have been persuaded that the salary paid to Father by his corporation did not represent the whole of his income. Of course, in the event that income has been artificially reduced by the obligor, the hearing officer may, to the extent that the evidence of record will support an appropriate finding, utilize earning capacity instead. *Commonwealth ex rel. Gitman v. Gitman,* 428 Pa. at 395, 237 A.2d at 186 ("court is not restricted to the husband's actual earnings but may also consider his earning power"); *McMahon v. McMahon,* 167 Pa. Super. 51, 74 A.2d 718 (1950) (same); *Hecht v. Hecht,* 189 Pa. Super. at 281, 150 A.2d at 142 ("If there

___

obligor to provide support, the guidelines shall place primary emphasis on the net incomes and earning capacities of the parties, with allowable deviations for unusual needs, extraordinary expenses and other factors, *such as the parties' assets,* as warrant special attention." (emphasis supplied)) Accord: *Hoag v. Hoag,* 435 Pa. Super. 428, 434, 646 A.2d 578, 581-82 (1994) ("Husband's actual financial condition is determinative. The trial court, in calculating a support award, must consider every aspect of a party's financial ability to pay, including property interests, stocks and other forms of investment."); *Shutter v. Reilly,* 372 Pa. Super. 251, 255-56, 539 A.2d 424, 426 (1988) (quoting 23 Pa.C.S. §4322); *Commonwealth ex rel. Gitman v. Gitman,* 428 Pa. at 395, 237 A.2d at 186 ("In determining the appropriate amount of the order the court is not restricted to the husband's actual earnings but may also consider . . . the nature and extent of his property."); *Commonwealth ex rel. Rankin v. Rankin,* 170 Pa. Super. 570, 573, 87 A.2d 799, 801 (1952) ("In any view the amount of the order is justified by the large capital resources of the respondent, considered in conjunction with his actual income."); *Hecht v. Hecht,* 189 Pa. Super. 276, 282, 150 A.2d 139, 143 (1959) ("The court below should have considered the father's property.").

is one rule regarding support orders which is firmly established, it is that the court is not restricted to the defendant's actual earnings, but should also consider his earning power."). As the Superior Court wrote in *Heisey v. Heisey,* 430 Pa. Super. 16, 20, 633 A.2d 211, 212 (1993):

"When actual, net earnings do not reflect earning capacity, the trial court should investigate a variety of sources to determine a party's true wealth. *DeMasi v. DeMasi,* 366 Pa. Super. 19, 34, 530 A.2d 871, 878 (1987). Normally, the court should pierce the corporate veil to determine if a spouse's ability to pay support is enhanced by advantages owing to ownership or membership in a corporation. See *e.g., Pacella v. Pacella,* 342 Pa. Super. 178, 492 A.2d 707 (1985) (where spouse receives numerous no-interest loans from corporation, has numerous personal expenses paid by corporation and co-mingles personal funds with corporate funds, it is appropriate to consider his earning capacity rather than salary in calculating alimony award)."

While a wide-reaching investigation into Father's earning capacity would have been entirely proper, the adjustment adopted in this case, adding hypothetical margin borrowing to reported income, finds no warrant in reason or in controlling case law.

As we have indicated, Father also challenges the hearing officer's determination of the reasonable expenses related to care of the children while in Mother's custody. The principles governing this determination are well-settled and include:

"In order to define the support obligation of each parent, a court must first determine the needs of the children: a

court has no way of arriving at a reasonable order of support unless it knows how much money is actually required to care for the children involved. . . . [P]arents are legally obligated to provide only for the *reasonable* expenses of raising their children. . . .

"This is not to say that children are entitled only to the bare necessities; parents do have an obligation to share with their children the benefit of their financial achievement. See *Conway v. Dana,* [456 Pa. 536, 538, 318 A.2d 324, 325 (1974)] ('station in life of the parties' is relevant in determining parents' capacity to support their children). Thus, where the parents' incomes permit, it may be perfectly proper for a court to recognize that certain expenditures for recreation, entertainment, and other nonessential items are reasonable and in the best interest of the children. . . .

"Nevertheless, neither parent should be obligated to pay for 'extras'—those items which go beyond what is reasonably necessary for the children's welfare—in which that parent does not concur. Neither parent should be permitted to increase the parties' support obligations by unilaterally indulging the children in things which are not reasonably necessary for their well-being. We hold, therefore, that in each case the hearing court must first calculate the reasonable expense of raising the children involved, based upon the particular circumstances—the needs, the custom, and the financial status—of the parties." *Melzer v. Witsberger,* 505 Pa. 462, 470-71, 480 A.2d 991, 995-96 (1984). (emphasis in original)

"[T]he purpose of a support order, such as that under review, is 'to secure such an allowance to [the] child as is reasonable, having in mind the husband's property and

earning capacity and the station in life [of] the parties.' *Commonwealth ex re [sic] Kallen v. Kallen,* 200 Pa. Super. 507, 508-509, 190 A.2d 175, 176 (1963). Moreover, 'a wealthy father has the legal duty to give his children the "advantages" which his financial status indicates to be reasonable.' *Branch [v. Jackson,* 427 Pa. Super. 417, 420, 629 A.2d 170, 171 (1993)] (quoting *Hecht v. Hecht,* 189 Pa. Super. 276, 150 A.2d 139 (1959)). . . . Thus, the critical factor in determining standard of living is clearly the financial circumstances of the [father], not his philosophical position on the precise limits of the good life— what he can afford is the question, not what he is willing to pay for." *Karp v. Karp,* 455 Pa. Super. 21, 27, 686 A.2d 1325, 1328 (1996), *appeal granted,* 549 Pa. 701, 700 A.2d 441 (1997). See also, *Edelstein v. Edelstein,* 399 Pa. Super. 536, 542, 582 A.2d 1074, 1077 (1990).

"Reasonable needs are not, of course, limited to the bare necessities of life. The reasonable needs of a child whose parent or parents are wealthy may well include items which would be considered frivolous to parents who are less well off. As was so eloquently stated by the Honorable Robert E. Woodside: 'necessaries,' and 'luxuries' are relative matters. . . . Children of wealthy parents are entitled to the educational advantages of travel, private lessons in music, drama, swimming, horseback riding, and other activities in which they show interest and ability. They are entitled to the best medical care, good clothes, and familiarity with good restaurants, good hotels, good shows, and good camps. It is possible that a child with nothing more than a house to shelter him, a coat to keep him warm and sufficient food to keep him healthy will be happier and more successful than a child

who has all the 'advantages,' but most parents strive and sacrifice to give their children 'advantages' which cost money. . . . A wealthy father has a legal duty to give his children the 'advantages' which his financial status indicates to be reasonable. . . . [A parent] should not be forced by a support order to make personal sacrifices to give them all the advantages to which we referred above, but a father with the assets, the youth, and the ability of the defendant can furnish his children with these advantages without any recognizable sacrifice on his part." *Branch v. Jackson,* 427 Pa. Super. 417, 419-20, 629 A.2d 170, 171 (1993) (quoting *Hecht v. Hecht* at 283-84, 150 A.2d at 143).

"In arriving at the amount a mother and children need in order to live properly, the court below seemed to be of the belief that so long as they were assured a roof over their heads, sufficient raiment and adequate food on the table, the husband-father had met his obligations of support. This reasoning is an erroneous one. If the husband-father can afford for himself a caviar-champagne standard of living, it is not justice, nor legal, that the wife should be content with a tent and bread-and-butter menu for herself and brood. Dignity of living, commensurate with income, is as much a necessity as the bare essentials for survival." *Commonwealth ex rel. Gitman v. Gitman,* 428 Pa. at 394, 237 A.2d at 185 (plurality opinion of Mr. Justice Musmanno).

"Of course, it is not the purpose of a support order to distribute the father's estate. . . . This does not mean, however, that the father's property and condition in life is not relevant in determining the amount of the order. Another rule firmly established in support cases is that

in fixing the order, the defendant's property and condition in life must be considered. . . .

"The court below likewise erred in taking too narrow a view on what the needs of the children are. He held, for example, that summer camps are a 'luxury,' and that expenses of this nature may not be included in a support order. In the case of most parents this would be true, but 'necessaries,' and 'luxuries' are relative matters. See *Gimbel Brothers Inc. v. Pinto,* 188 Pa. Super. 72, 145 A.2d 865 (1958) where we held that a fur coat was a necessary.

Father does not here challenge the recommended order as beyond his means. Neither does he challenge the determination that Mother's reasonable needs exceed her separate income. The issue presented under the *Melzer* formula, therefore, is reasonable needs of the children. As we have indicated, the hearing officer found the reasonable child-rearing expenses incurred by Mother as custodial parent to equal $8,253 per month.

Mother's evidence of these expenses centers on her exhibit P-4; a one-page list styled "Jennifer Sanchez statement of expenses." Our description of the limitations of a similar document offered into evidence by the natural mother as custodial parent in the case reported as *deMoss v. Bentley,* 46 Ches. Co. Rep. 11 (1998) is equally applicable here:

"She submitted . . . a list of expenses she purportedly allocates, or wishes she could allocate, to [the child]. She predicated her list upon speculation, basing her figures on estimates of expenses that might be incurred if her circumstances were consistent with the lifestyle to which she herself would like to be accustomed." *Id.* at 13.

Mother does not assert that the expenses listed on P-4 represent current expenditures as, indeed, they could not inasmuch as they greatly exceed in the aggregate all of the income available to Mother.[20] Moreover, Mother makes no attempt to explain how it is possible that she is able to defray all of her own living expenses by means of her income after taxes of $11,054 per year but requires three times this amount or $33,012 per year[21] to defray the living expenses of each of her minor children.[22]

As we have indicated, Father challenges the hearing officer's determination of the reasonable needs of the children in four respects: (1) that it was error to attribute to the children 75 percent of Mother's debt-service in connection with the home in Phoenixville in which she and the children reside; (2) that certain expenses paid

---

20. Mother responded with the assertion "I currently cannot" to the following question: "You're really not spending that amount of money for yourself and the children at the present time?" N.T. 47 p. 57.

21. $8,253 monthly times 12 months divided by three children.

22. We recognize that the desire of Mother to have her children enjoy a lifestyle more costly than her own and more nearly approaching that of Father explains a portion of this discrepancy. This factor, in our view, cannot explain the whole of this inconsistency in Mother's position. On the basis of this inconsistency alone, we are compelled to conclude either that the reasonable expenses of the children are less than that determined by the hearing officer or that Mother's separate income is greater than she has reported. Since Mother has no significant source of income other than her part-time employment and the monies she receives from Father and there is no evidence that Mother is consistently living beyond her means, she can have no expenses beyond those within the means created by her employment income unless she devotes a portion of the monies she receives from Father to that purpose. We will not assume such misappropriation. Therefore, the conclusion is inescapable that the reasonable expenses of the children are less than that determined by the hearing officer.

directly by Father were improperly treated as Mother's expenses for calculation purposes; (3) that the expenses incurred by Father while the children are in his custody were improperly disregarded; and (4) that certain particular expenses as found by the hearing officer, especially those related to gifts, entertainment and vacation, were overstated.

We agree with Father that it was error to attribute three-fourths of Mother's home-related debt service to the children. The home in which the children and mother reside is titled in Mother's name alone and constitutes a capital asset of Mother.[23] An undisclosed portion of the monthly debt-service reduces the principal indebtedness with respect to this capital asset and, therefore, becomes an element of Mother's net worth. While a mathematical apportionment of *interest expense* among the residents may be justified, there is no reason to place on Father any part of the expense related to principal debt. We so held by order dated June 30, 1999, in *Milligan v. Milligan,* docketed to no. 0169N1999 and no reason has been offered by Mother why reconsideration of this decision is here required.

Father contends that the hearing officer erred in treating expenses related to summer activities and vacations, educational activities, and clothing as Mother's when, assertedly, they were borne by Father.[24] We disagree. The formula specified in *Melzer* and applied by the hearing officer does not depend for its proper application on the correct identification of the party who, in the period prior to the proceeding, was responsible for defraying any

23. N.T. at p. 46.
24. Father's exceptions at ¶2(a).

particular expense. Rather, the result of the *Melzer* formula flows exclusively from a determination of each of the parents' income available for support and the reasonable needs of the children. Each parent is obligated to pay that portion of the reasonable needs of the children which that parent's available income bears to the total available income. This result may be adjusted to reflect various, specified unusual factors, but the identity of the party previously responsible for particular expenses is not among these. Therefore, if, as Father contends, the hearing officer erred in such a finding of prior responsibility, the error was harmless.

The hearing officer concluded that the children are in the custody of Father less than 10 percent of the time and, on this basis, disregarded from the analysis the custodial expenses incurred by Father during that period. Father contends that the record fails to support the finding as to the proportionate custodial time period and, therefore, his custodial expenses should not have been disregarded.[25]

---

25. Pursuant to Pa.R.C.P. no. 1910.16-4(c)(1):

"The support guidelines contemplate that the obligor has regular contact, including vacation time, with his or her children, and that he or she makes direct expenditures on behalf of the children. When, however, the children spend 40 percent or more of their time during the year with obligor, a rebuttable presumption exists that the obligor is entitled to a reduction in the basic support obligation to reflect this additional time. Except as provided in subsections (2) and (3) below, the reduction shall be calculated pursuant to the formula set forth in part II of subdivision (a) of this rule. For purposes of this provision, the time spent with the children shall be determined by the number of overnights they spend during the year with obligor."

No view of the record would support a finding that the children, individually or in any combination, even approach 40 percent of the

The parties dispute the extent of the time the children spend with their Father. Mother's counsel somewhat disingenuously confined his testimonial examination to the period when *all three children* were with Father[26] knowing that the many conflicting activities of the children only rarely permit them to visit their Father jointly and that visits by one or two children are the norm. However, Father did not attempt to quantify with any specificity the frequency or duration of such visits although he asserted that records available to him would have permitted such an analysis.[27] On this state of the record we cannot accept Father's assertion of error on the part of the hearing officer.

Father contends that the expenses utilized by the hearing officer for gifts, entertainment and vacation were overstated. In the report, the hearing officer attributed $38 per month to the childrens' reasonable expenses for the purpose of gifts, $750 per month for entertainment and $500 per month for vacation. This compares to the figures contained in Mother's exhibit P-4 of $413, $750, and $730. We cannot argue with the figure for gifts as adjusted by the hearing officer. The figures for entertainment and vacation, amounting to $9,000 and $6,000 per year respectively, represent substantial expenditures and are wholly unsupported on this record by anything more than Mother's "wish list."

---

yearly "overnights" with Father. Indeed, with the exception of vacation travels, overnight visiting with Father appear on this record to be quite rare.

26. N.T. at p. 86.

27. N.T. at p. 88.

Father's principled disagreement with the report and recommended order centers on the necessity of any judicial involvement in this matter. For more than 13 years the parties successfully governed their affairs in accordance with their consensual agreement, incorporated in their divorce decree. In the light of the frequency and heated emotionality attending disputes in such matters, this is no small achievement and the parties are to be congratulated first for their foresight in drafting an agreement which, by means of a generous cost-of-living escalator, provided for the inevitable effect of the changing value of money as well as the increasing expense associated with child-rearing as children mature; and, even more significantly, for their evident ability to give proper priority in their effectuation of the agreement to the well-being of their children. There is no contest here that Father loves his children and has acted accordingly. In addition to matters related to ongoing support, it is undisputed that Father lavishes on his children expensive vacations, entertainment and gifts and has created and regularly funds substantial trust accounts for each of his offspring.[28]

When we re-examine the recommended order taking into account the determinations set forth above and disregarding at this juncture those expenses for which Father has traditionally reimbursed Mother or has paid directly the provider or supplier,[29] we find that about $500

28. At the same time, however, we would not permit Father to so arrange financial matters as to reserve to himself all of the largesse and joyful activities enjoyed by his children. Mother does not argue and there is no indication on this record that this has occurred.

29. We include and adopt the hearing officer's determinations with respect to the childrens' expenses for electric, gas and water utilities,

per month remains out of the agreed monthly payment of \$3,250[30] for entertainment, vacation and gifts.[31] The evidence adduced by Mother is entirely insufficient to the task of establishing the inadequacy of this amount for these purposes. We find, therefore, that the reasonable needs of the children will be met and the obligations of support of Father will be satisfied by the following[32]

## ORDER

And now, July 9, 2001, consistent with the foregoing opinion, and based on the court's determination that Michael A. Sanchez' monthly income available for support is sufficient to meet the whole of the childrens' reasonable needs; that Jennifer L. Sanchez has no income

---

telephone (including Andrew's cellular telephone), lunches, automobile fuel, clothing, food, haircutting, allowances, household help, homeowner's insurance, periodical subscriptions, cable television and internet provider. The evidence indicates (and we will require) that Father reimburses or directly pays for expenses related to health/medical insurance for all three children and auto insurance for Andrew, unreimbursed medical, dental, orthodontic, optician and other therapeutic services, private school tuition and books, all school activity fees, all fees related to extracurricular activities including without limitation sports, horseback riding, art classes and supplies, and lessons involving music and musical instruments, and a portion of the vacation expense; specifically, those vacations which the children take with Father and those which they take alone and he approves.

30. This was the figure in calendar 2000. It must be adjusted to reflect this year's cost-of-living increase.

31. The aggregate of the figures determined by the hearing officer for those expenses enumerated in the first sentence of the preceding marginal note is \$2,766 per month.

32. Our resolution of these issues renders moot the matters raised by Father's petition.

in excess of her reasonable needs; and that the reasonable needs of the children apart from those expenses paid directly by Father and specified below equal $3,250 per month[33] (including $500 for entertainment, gifts and vacations with Mother), the following is hereby ordered and decreed:

(1) Michael A. Sanchez shall pay to the Chester County Domestic Relations office for transmission to Jennifer L. Sanchez the sum of $3,445 per month[34] to be adjusted annually on the date of this order by the addition of a cost-of-living increase in the amount of six percent; for the support of Andrew, Jessica, and Shauna Sanchez (the children); subject to the following:

(2) Michael A. Sanchez shall, on submission of appropriate requests and/or invoices or notices of required payment, reimburse Jennifer L. Sanchez or pay directly to the provider or supplier all expenses related to the following on behalf of the children: all health/medical insurance and auto insurance for Andrew; unreimbursed medical, dental, orthodontic, optician and other therapeutic services; private school tuition and books; all school activity fees; all fees related to extracurricular activities including without limitation sports, horseback riding, art classes and supplies; extracurricular lessons including without limitation those involving music and musical instruments; and a portion of the vacation expense; specifically, those vacations which the children take with Father and those which they take alone and he approves.

---

33. In calendar 2000.
34. $3,250 plus six percent cost-of-living increase of $195.

(3) Arrearages, if any, shall be paid in one lump sum to the Chester County Domestic Relations Office for transmission to Jennifer L. Sanchez within 30 days of the date of this order.

## IMPORTANT LEGAL NOTICE

Parties must within seven days inform the domestic relations section and the other parties, in writing, of any material change in circumstances relevant to the level of support or the administration of the support order, including, but not limited to, loss or change of income or employment and change of personal address or change of address of any child receiving support. A party who willfully fails to report a material change in circumstances may be adjudged in contempt of court and may be fined or imprisoned.

Pennsylvania law provides that all support orders shall be reviewed at least once every three years if such a review is requested by one of the parties.

A mandatory income attachment will issue unless obligor is not in arrears in payment in an amount equal to or greater than one month's support obligation and (1) the court finds that there is good cause not to require immediate income withholding; or (2) a written agreement is reached between the parties which provides for an alternate arrangement.